In the Matter of the GUARDIANSHIP OF C.M.W., a minor child,

Carl Dennis White, Appellant–Petitioner,

v.

Lisa White, Appellee–Respondent.

No. 29A05–0104–CV–165.

Court of Appeals of Indiana.

Sept. 14, 2001.

Thomas B. O'Farrell, McClure & O'Farrell, P.C., Westfield, IN, Attorney for Appellant.

Jill E. Goldenberg, Cohen Garelick & Glazier, Indianapolis, IN, Attorney for Appellee.

**OPINION**

KIRSCH, Judge.

Carl Dennis White (Grandfather) appeals the trial court's order finding him in contempt, raising the following issues for review:

I. Whether the trial court had subject matter and personal jurisdiction over the guardianship of a child who had lived in Indiana, but moved to Arkansas prior to the commencement of the guardianship proceedings.

II. Whether the trial court's order of contempt was detailed enough to satisfy Grandfather's right to due process where it stated only generally that Grandfather was in contempt.

III. Whether the trial court erred in setting Grandfather's appeal bond

for the amount of the other party's hearing and appellate attorney fees.

We affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

C.M.W. was born on January 7, 1997 in Clinton County, Illinois to Lisa White (Mother). From his birth until January 2000, Mother and C.M.W. lived in Illinois. In January 2000, Mother and C.M.W. moved to Indiana. For the first two months, they lived with Grandfather and his wife in their residence. After that time, Mother and C.M.W. lived in an apartment on Grandfather's property.

In November 2000, Mother and C.M.W. moved to Arkansas and established residence with Mother's boyfriend and two roommates. Mother obtained an Arkansas driver's license and health insurance for C.M.W. from the State of Arkansas. She also registered to vote and secured employment.

In mid-January 2000, Mother and C.M.W. returned to Indiana with Mother's boyfriend while he was on a temporary work assignment in Indiana. They lived in a hotel room paid for by Mother's boyfriend's employer. After a few days, Mother sent C.M.W. to live in Illinois with her mother, C.M.W.'s grandmother.

On February 27, 2001, Grandfather filed an emergency petition to establish guardianship of C.M.W. alleging that C.M.W. was in immediate danger, which the trial court granted. Grandfather traveled to Illinois to C.M.W.'s grandmother's house, retrieved the child, and assumed custody of him. In response, Mother filed a motion to dismiss Grandfather's petition.

After a hearing on March 20, 2001, the trial court found that it did not have subject matter or personal jurisdiction over the case and granted Mother's motion to dismiss. In addition, it found Grandfather in contempt and ordered him to pay Mother's attorney fees of $2640 or spend twenty-one days in jail. Thereafter, the trial court set the appeal bond in an amount equal to Mother's attorney fees for the case, including appeal. Grandfather now appeals.

## DISCUSSION AND DECISION

 Grandfather first argues that the trial court erred in determining that it lacked jurisdiction over the guardianship proceedings. There are three types of jurisdiction: 1) jurisdiction of the subject matter; 2) jurisdiction of the person; and 3) jurisdiction of the particular case. *In re Guardianship of K.T.*, 743 N.E.2d 348, 351 (Ind.Ct.App.2001); *Miller v. Moore*, 696 N.E.2d 888, 889 (Ind.Ct.App.1998). Subject matter jurisdiction refers to the power of a court to hear and decide a particular class of cases. *K.T.*, 743 N.E.2d at 351. When a court lacks subject matter jurisdiction, its actions are void ab initio and have no effect whatsoever. *Id.*

The jurisdiction of Indiana courts to hear guardianship actions is set by statute. The statute explains that an Indiana court has exclusive original jurisdiction over "[t]he business affairs, physical person, and property of every incapacitated person and minor *residing* in Indiana." IC 29–3–2–1(a)(1). Here, there was sufficient evidence to support the conclusion that C.M.W. did not reside in Indiana. First, C.M.W. was not physically present in Indiana when the petition was filed, but was in Illinois. He and Mother had recently moved to Arkansas from Indiana. Mother returned temporarily to Indiana to accompany her boyfriend on a work assignment and left C.M.W. with her mother in Illinois. The trial court did not err in

determining that it did not have jurisdiction under the guardianship statute.

Nonetheless, Grandfather points to *In re Support of Seligman*, 542 N.E.2d 1030, 1032 (Ind.Ct.App.1989), where a panel of this court stated that guardianships over persons must be instituted in compliance with the Uniform Child Custody Jurisdiction Act (UCCJA). We explained that "[t]his linkage to custody law is nothing more than a product of the realization that the duties of a guardian over the person and one with custody over a child are synonymous." *Id. See also In re Paternity of Robinaugh*, 616 N.E.2d 409, 411 (Ind. Ct.App.1993) ("in any proceeding in which child custody is one of the issues, the UCCJA comes into play if there is an interstate dimension"). We further note that IC 29-3-2-1(d) states that "courts with child custody jurisdiction under [the UCCJA] have original and continuing jurisdiction over custody matters relating to minors."

■ Assuming the UCCJA applies here, our conclusion that the trial court lacked subject matter jurisdiction would remain unchanged. Under the UCCJA, an Indiana court has an affirmative duty to question its jurisdiction when it becomes aware of an interstate dimension in a child custody dispute. *Pryor v. Pryor*, 709 N.E.2d 374, 376 (Ind.Ct.App.1999). The trial court must first determine whether it has jurisdiction, and, if it does, whether to exercise that jurisdiction. *Id.* In determining whether a trial court has improperly exercised jurisdiction under the UCCJA, we apply an abuse of discretion standard. *Id.* An abuse of discretion will occur when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.* IC 31-17-3-3, the jurisdictional provision of the UCCJA states:

(a) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) this state

(A) is the home state of the child at the time of commencement of the proceeding, or

(B) had been the child's home state within six (6) months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state;

(2) it is in the best interest of the child that a court of this state assume jurisdiction because

(A) the child and his parents, or the child and at least one (1) contestant, have a significant connection with this state, and

(B) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

(3) the child is physically present in this state and the child has been abandoned; or

(4) (A) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and

(B) it is in the best interest of the child that this court assume jurisdiction.

(b) Except under paragraphs (3) and (4) of subsection (a) physical presence in this state of the child, or of the child and one (1) of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

(c) Physical presence of the child, while desirable, is not prerequisite for jurisdiction to determine his custody.

█ Jurisdiction is established under subsection (1) only if Indiana is or has been the home state of the child. *Rios v. Rios,* 717 N.E.2d 187, 191 (Ind.Ct.App. 1999). IC 31–17–3–2(5) defines "home state" as "the state in which the child, immediately preceding the time involved, lived with his parents, a parent, or a person acting as parent, for at least six (6) consecutive months, . . . . Periods of temporary absence of any of the named persons are counted as part of the six (6) month or other period[.]"

█ Here, during the three months prior to Grandfather's emergency petition, C.M.W. lived in Arkansas with Mother. Prior to that, he lived in Indiana with Mother. Thus, neither Arkansas nor Indiana qualifies as C.M.W.'s home state.

█ When the "home state" test does not apply to the facts, the "significant connection" test found in IC 31–1–11.6–3(a)(2) may be used to provide an alternative basis for subject matter jurisdiction. *Rios,* 717 N.E.2d at 192; *Williams v. Williams,* 609 N.E.2d 1111, 1113 (Ind.Ct.App.1993).

In *Brokus v. Brokus,* 420 N.E.2d 1242, 1248 (Ind.Ct.App.1981), we applied the significant connection test to determine whether an Indiana court had jurisdiction of a custody matter under the UCCJA. After establishing that the children had no home state because they had been in Indiana for the previous five months, we noted that during that time, they were enrolled in nursery school and attended church regularly with their mother. Also, the Porter County Department of Welfare had prepared a report as to the condition of the home in which they were living. Because there was substantial evidence available in Indiana concerning the welfare of the children, we held that Indiana had a "significant connection" to the children and their mother. Accordingly, the trial court properly determined it had jurisdiction over the matter. *Id.*

By contrast, here, Mother and C.M.W. have not lived in Indiana for three months prior to the filing of the emergency petition. Grandfather's emergency petition was based on the conditions of Mother's home. Indiana has no connection to that home. If necessary, Arkansas authorities can investigate Grandfather's allegations, implement a plan for C.M.W.'s welfare, and monitor compliance with the plan. Moreover, to the extent that the conduct Grandfather complains of is criminal, Arkansas has jurisdiction to bring criminal charges. In short, all of the evidence concerning C.M.W.'s welfare and upbringing is available in Arkansas. The trial court did not err in finding that Indiana did not have a significant connection to this controversy to establish personal and subject matter jurisdiction. *See Williams,* 609 N.E.2d at 1113 (residency of one of the contestants in custody dispute in Indiana insufficient to create "significant connection" in Indiana to establish jurisdiction in Indiana under the UCCJA, where child and other contestant live in another state).

Grandfather next contends that the trial court's contempt order is too vague to comport with the requirements of due process. The court's order states merely that the court found Grandfather in contempt. At a subsequent hearing, Grandfather asked the court to specify which actions it found contemptuous. The trial court stat-

ed that it "found the grandfather in contempt because of his misrepresentation[s] to the Court which were clearly evident from his testimony." *Transcript of Proceedings of March 29, 2001* at 3. The court then explained that Grandfather's actions amounted to civil contempt, "[b]ut it has over tones as well of criminal contempt in the sense that the Court also found that his statements were perjurious as well." *Id.* at 4. When Grandfather specified that the trial court had found indirect contempt, the trial court added "And direct contempt." *Id.* Thus, the Record is less than clear about what the trial court intended.

■ In reviewing a contempt judgment we will not reweigh evidence or judge credibility of witnesses. *Funk v. Macaulay*, 457 N.E.2d 223, 230 (Ind.Ct.App. 1983). If the evidence and all reasonable inferences which may be drawn therefrom support the trial court's decision, that decision stands. *Id.*

■ Citations for civil contempt are intended to be coercive, while those for criminal contempt are meant to be punitive. *Hopping v. State*, 637 N.E.2d 1294, 1296 (Ind.1994), *cert. denied*, 513 U.S. 1017, 115 S.Ct. 578, 130 L.Ed.2d 493 (1994). Civil contempt is for the benefit of the party who has been injured or damaged by the failure of another to conform to a court order issued for the private benefit of the aggrieved party. *Cowart v. White*, 711 N.E.2d 523, 530 (Ind.1999) (citing 17 C.J.S. Contempt § 6 (1963) (civil contempt is failing to do something ordered to be done by a Court in a civil action for the benefit of an opposing party)), *clarified on reh'g on other grounds* 716 N.E.2d 401 (1999). To be punished for civil contempt of a court's order, there must be an order commanding the accused to do or refrain from doing something.

*Williamson v. Creamer*, 722 N.E.2d 863, 865 (Ind.Ct.App.2000).

■ In this case, Grandfather did not fail to conform to a court order issued for Mother's benefit. Indeed, the trial court had not issued any orders beyond the granting of the temporary guardianship at the time. Thus, the trial court abused its discretion in finding Grandfather in civil contempt.

■ Direct criminal contempt involves actions occurring near the court that interfere with the business of the court, and of which the judge has personal knowledge. *Hopping*, 637 N.E.2d at 1296. Any act which manifests a disrespect and defiance of a court may constitute direct criminal contempt. *Id.*

■ IC 34–47–2–4 provides summary proceedings for disposing of direct contempt. Our supreme court has explained that such summary procedures are necessarily because of the immediate threat to the integrity of the court from direct contempt. "It is essential for a court to be able '[t]o protect itself against gross violations of decency and decorum ...' as it pursues justice." *Id.* at 1296–97 (quoting *Brown v. Brown*, 4 Ind. 627, 627 (1853)).

However, in *In re Marriage of Neiswinger*, 477 N.E.2d 257, 260 (Ind.1985), our supreme court held that giving false testimony, the falsity of which could not be known but only inferred by reference to later testimony and which causes no disturbance or disruption to the proceedings does not warrant a summary conviction and, therefore, is not a direct contempt. It determined that had the false witness committed direct contempt, summary action would have been appropriate, but his alleged contempt did not pose a sufficient threat to the order of the court to warrant such dispensation with due process rights afforded to others, including those accused

of indirect contempt. Accordingly, the court held that the witness was denied his due process rights when he was convicted without notice or an opportunity to be heard, or the procedural rights guaranteed one charged with indirect contempt. *Id.* at 262.

■■■ Likewise, here, the trial court's contempt finding was issued in response to Grandfather's misrepresentations in his emergency petition. However, the misleading nature of these statements was not evident until the trial court heard the testimony of other witnesses. Grandfather did not cause a disruption or disturbance of the proceedings. His actions may have been frivolous, unethical, malicious, or even perjurious, but they are not directly contemptuous.

■■■ Indirect contempt undermines the activities of the court but fails to satisfy one of the other direct contempt requirements. *Hopping,* 637 N.E.2d at 1296. IC 34–47–3–1 *et seq.* describes the actions by which one can be held in indirect contempt of court: willful disobedience of a process or order, IC 34–47–3–1; resisting process, IC 34–47–3–2; assaulting, influencing, or intimidating witnesses, IC 34–47–3–3; and false or inaccurate report of a proceeding, IC 34–47–3–4.

In such cases, IC 34–47–3–5 provides clear due process protections. It states:

(a) In all cases of indirect contempts, the person charged with indirect contempt is entitled:

(1) before answering the charge; or

(2) being punished for the contempt;

to be served with a rule of the court against which the contempt was alleged to have been committed.

(b) The rule to show cause must:

(1) clearly and distinctly set forth the facts that are alleged to constitute the contempt;

(2) specify the time and place of the facts with reasonable certainty, as to inform the defendant of the nature and circumstances of the charge against the defendant; and

(3) specify a time and place at which the defendant is required to show cause, in the court, why the defendant should not be attached and punished for such contempt.

(c) The court shall, on proper showing, extend the time provided under subsection (b)(3) to give the defendant a reasonable and just opportunity to be purged of the contempt.

(d) A rule provided for under subsection (b) may not issue until the facts alleged to constitute the contempt have been:

(1) brought to the knowledge of the court by an information; and

(2) duly verified by the oath of affirmation of some officers of the court or other responsible person.

None of these due process considerations were afforded Grandfather before the trial court found him in contempt. Therefore, we must reverse that portion of the trial court's order finding Grandfather in contempt.

■■■ Finally, Grandfather argues that the trial court erred in setting the amount of his appeal bond equal to the total cost of Mother's attorney fees for the hearing and appeal. Trial courts have the authority to set an appeal bond. *See* Ind. Trial Rule 62(D)(2). Further, the fixing of the amount of the appeal bond is in the discretion of the trial court. *Anthrop v. Tippecanoe Sch. Corp.,* 156 Ind.App. 167, 173, 295 N.E.2d 637, 641–42 (Ind.Ct.App.1973). At this stage of the proceedings, the issue

of the amount of the appeal bond is moot and we decline to address it.

Affirmed in part and reversed in part.

BAILEY, J., and BROOK, J., concur.